UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHARLES ORCUTT | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )  C.A. No.: 3:13-cv-01455 (MPS) |
| | ) |
| TOYOTA MOTOR SALES, U.S.A., INC.;<br>TOYOTA MOTOR CORPORATION | )<br>) |
| | ) |
| Defendants. | )<br>)<br>) |

## **PLAINTIFF CHARLES ORCUTT'S DAMAGES ANALYSIS**

The Plaintiff, 25 year old Charles Orcutt, hereby submits the following Damages Analysis to the Defendant in the above-captioned action. In sum, Mr. Orcutt asserts that as a result of a defective product manufactured, designed and sold by the Defendants, he sustained a fractured spine which has made him a paraplegic necessitating hospital care, doctor care and therapy. The Plaintiff further asserts that he sustained economic losses including medical bills, lost wages, and lost earning capacity, and he has suffered non-economic losses including pain and suffering, permanent injury and mental pain and anguish, all as a result of the Defendant's defective product.

A. **MEDICAL TREATMENT**

At the time of the accident of December 21, 2010, Mr. Orcutt was twenty-one years old. Following the collision, ambulance and fire department personnel engaged in a prolonged extrication of about 30 minutes without a loss of consciousness. At the scene, Mr. Orcutt complained of posterior neck pain, stated that his legs felt asleep, that

his abdomen felt asleep, and he complained of numbness in his arms and hands as well. He had no recall of the events of the accident. He was taken to Hartford Hospital where a CAT scan of the head was negative for any hemorrhages; however, a CAT scan of the C-spine revealed a comminuted C7 burst fracture with a retropulsion into the spinal canal. There appeared to be a T2 body fracture as well and a questionable Cl ring fracture on the left. He was diagnosed as suffering with a T4-5 sensory level and comminuted C7 body fracture with retropulsion of the spinal canal and a questionable Cl ring fracture on the left and T2 body fracture. Unfortunately, Mr. Orcutt was estranged from his family and did not keep in touch with them. The patient's uncle had been contacted, but he had not seen the patient in about a year.

Subsequently on 12/22/2010 with a diagnosis of C7 burst fracture with spinal cord injury, Inam Kureshi, M.D. undertook a C6-C7 anterior cervical discectomy, C7-T1 anterior cervical discectomy, among multiple other procedures, noting that Mr. Orcutt suffered a severe spinal cord injury with C7 paraplegia with no motor and sensory function below C7. This was due to the burst fracture at the C7 causing cord compression. He now presented for elective decompression and stabilization of this fracture.

On 01/12/2011 Mr. Orcutt was discharged from Hartford Hospital. He also had additional consultations by psychiatry, physical medicine rehabilitation, (Dr. Seetharama), orthopedics, (Dr. Fischer), and neurosurgery (Dr. Schwartz). He had a Glasgow Coma Score of 15 on arrival at the trauma service. The hospital course noted the surgery. A CAT scan on the following day revealed good alignment. Physical therapy, occupational therapy, physiatry, and psychiatry provided assistance. Dr.

Seetharama reported that Mr. Orcutt would be a good candidate for acute rehabilitation for an eventual spinal cord rehabilitation program (Lourdes Castanon, M.D.)

Mr. Orcutt remained at Hartford Hospital until he was transferred to the Hospital for Special Care on January 26, 2011. The transfer summary indicates a discharge diagnosis of motor vehicle crash, CI posterior arch fracture; C7 burst fracture; paraplegia new onset; T2 compression fracture; T2-T4, T6 spinous process fracture; left 8-10 rib fractures; left acetabular fracture. Procedures performed were C7 corpectomy with C6-T1 fusion; IVC filter placement. He had been doing well. He continued though to have blunted affect during his hospital course. He would be discharged to the Hospital for Special Care for acute spinal cord rehabilitation. He was on multiple medications including Senokot, Dulcolax, a multivitamin, ibuprofen, Ambien, Fragmin, Neurontin, oxycodone, vitamin C, and Robaxin.

The discharge summary from The Hospital for Special Care generated by Dr. Seetharama noted that Mr. Orcutt was admitted on 01/26/2011 and discharged on 03/09/2011. The diagnosis was incomplete tetraplegia. Dr. Seetharama noted that Mr. Orcutt was a 21-year-old male patient admitted to the hospital status post motor vehicle car versus telephone pole, restrained passenger. He had injuries including blunt spine trauma with C7 vertebral body burst fracture; T2 compression fracture; avulsion fracture at T2, T3, T4, and T6; questionable loss of consciousness with traumatic brain injury; scalp hematoma; CT of the head was negative; chest injury with rib fractures. He had alcohol and cannabis in his system. He underwent a C7 corpectomy; an ACDF at C6-T1 done on 12/22/2010; he had a left Colles fracture and a left acetabular fracture; both were treated nonoperatively. He had a large stage II sacral decubitus. Past medical

history was notable for an old leg fracture from a soccer injury. He had no history of tobacco or alcohol abuse. Apparently, he smoked marijuana. He was estranged from his family and lived in a rental place. He was unemployed, but worked in construction. The patient during his hospital course had some issues with dysreflexia secondary to bowel constipation, resolved with a bowel clean-out. He was presently on a good bowel program every day without breakthrough. Bladder wise, he had reflux voiding. Studies were done. He was found to be voiding at high pressures and a small dose of Flomax was increased and added to his dose of Ditropan. Since then, the patient had been voiding well. He did not have any urinary tract infections. He was maintained on Fragmin for DVT prophylaxis. He had some issues with orthostasis in rehabilitation. He was started on midodrine and was stabilized. At the time of discharge, he was an ASIA C incomplete T2-T11 sensory T2-T11 motor spinal cord injury. His strength in the upper extremities was normalized at 5/5. He had some improved strength in the lower extremities. Functionally, he was doing very well. He was on an every other day bowel program, independent with suppository insertion. His discharge diagnosis was incomplete tetraplegia T2; neurogenic bowel and bladder; decubitus stage II, resolved; history of orthostasis on midodrine; spinal cord injury status post ORIF, resolved; left acetabular fracture, resolved; mild traumatic brain injury, resolved. Cognitively, the patient was doing well. He was well adjusted. He though had some anxiety issues.

On 04/26/2012 Mr. Orcutt was discharged from Easter Seals Capital Region & Eastern Connecticut Physical Therapy. At that juncture he was a 23-year-old man who was at The Hospital for Special Care and remained for approximately five weeks before being discharged home. He did not have any insurance coverage following his

discharge and, therefore, went without any therapy until November 2011. At that time, he received physical therapy at The Hospital for Special Care from November through December, but discontinued when he felt he was not challenged. He recently had moved to the Windsor area and was looking to continue therapy to improve his mobility, strength, and to work on regaining function of his lower extremity so that he could eventually return to walking. He had some motor activity in the right lower extremity, but no motor function in the left lower extremity. He did not perform any standing or walking exercises. Light touch and sensation were intact for the right lower extremity, but diminished in the L2-L3 dermatome in the left lower extremity, otherwise intact. He had some trunk control and was able to maintain upright sitting with cueing. Skin was intact with no areas of breakdown. Skilled physical therapy was recommended to improve his core strength, manage tone, and enhance motor recovery so that he could improve his function and mobility.

On 04/26/2012 an occupational therapy discharge summary was generated from the Easter Seals Capital Region & Eastern Connecticut. He reported to the occupational therapist that he had been hospitalized briefly for treatment of the right elbow bursitis that had required immediate medical attention. OT intervention focused on patient education, pain reduction for the shoulder, postural strengthening in the standard frame, and in unsupported sitting. Progress was limited due to the patient's inconsistent attendance in therapy and by exacerbation of shoulder pain during some activities outside of PT that negated the pain relief obtained during treatment. He also decided to pursue physical therapy in another facility that was staffed sufficiently to allow two or more PTs to assist during therapy. It was also noted in the initial evaluation that he was

taking 0.5 mg of Xanax as needed for anxiety. He smoked cannabis two times a day for pain. He reported either ordering out or having groceries delivered. He was estranged from his parents and siblings and relied on his cousin for transportation. He lived alone in a first floor room in a hotel with a roll in shower, a microwave skillet and a small fridge. He had graduated six months earlier from high school and worked for his uncle's construction company up until at the time of the accident. He was currently not working.

On 02/13/2013 Mr. Orcutt was evaluated by Jeffrey Perry, DO, a physiatrist. Dr. Perry delineated the history, summarized records, and conducted an examination. His impression was that Mr. Orcutt was injured in motor vehicle accident on 12/21/2010 and sustained multiple fractures for which he underwent surgical intervention with diagnosis of incomplete tetraplegia. He will require ongoing care and treatment by multiple health care providers. He requires visits by his primary care physician, as well as care specialists in the field of urology, orthopedics, and physiatry, specializing in pain management, to coordinate his care. Podiatry care can also be expected. He has had episodes of skin breakdown that may require dermatological and/or plastic surgical evaluation. Psychological and psychiatric care was also recommended. Physical therapy and aqua therapy was recommended. He required multiple studies such as EMG and nerve conduction studies as well as MRI studies of the cervical spine. The nerve conduction studies would be of consideration given ulnar nerve decompression and median nerve decompression. He may require further surgical intervention for the cervical spine. Medications including baclofen pump implementation, Lyrica for neuropathic pain, and Ultram for pain control were recommended as well. These would entail laboratory monitoring. Durable medical equipment, extremity orthotics for both

upper and lower limbs, multiple wheelchairs, a driving evaluation, and an accommodated wheelchair accessible home were also noted. He requires personal items. Support assistance is needed and would likely increase as he ages.

### B.  DAMAGES – ECONOMIC AND NON-ECONOMIC

Background and Current Situation

Mr. Orcutt was born and raised in Connecticut, describing a difficult childhood. By age nine, he was placed in foster care, acknowledging a family history of substance abuse. His foster placement was difficult as well. By age 18, he "signed myself out." His early history is also remarkable for a diagnosis of ADHD with appropriate medications. He was in special education classes in the lower grades, but was mainstreamed by high school, graduating, although he was a "wild kid." After high school, he attempted technological training, studying HVAC, but the course work was too academically oriented. He has no additional formal education or training.

After he left school, Mr. Orcutt moved in with his uncle and continued to work in the construction trades, which he had done since age 16. He did well, moved out, purchased a car, and had his own apartment. He primarily worked as a construction laborer, but was also a heavy equipment operator.

When Mr. Orcutt was injured at age 21, he was residing in Enfield, Connecticut. After he sustained his traumatic injury, he was hospitalized for approximately 10 weeks and then moved in with his father's sister's ex-husband who resided in a large ranch-style house. He eventually settled in the Bradley Hotel in Windsor Locks, Connecticut, in a one-room wheelchair accessible studio apartment on the first floor with a roll-in shower. He had a microwave and a small refrigerator. House cleaning came once a

week. He had no other formal care with his friends providing the additional assistance, such as taking his clothes to the Laundromat, doing his grocery shopping, etc. Fortunately, he remains basically competent in simple activities of daily living. However, he still requires occasional assistance from his cousin, a CNA, who helps with lower extremity activities. He is not working, presently receiving SSD, his only source of income. [This is insufficient to cover his monthly expenses, with the additional funds arising from loans.]

Mr. Orcutt remains under the monitoring of Dr. Seetharama, a physiatrist from The Hospital for Special Care. He has stopped taking his medications as he has continued to utilize cannabis informally instead. [He now has an appointment with a physician to obtain medical marijuana.] He finds marijuana helpful in controlling pain and spasticity. He is not engaged in formal psychiatric intervention nor vocational retraining, although he has already contacted the rehabilitation services in Connecticut. He though is very concerned about what kind of work he could possibly do. Sedentary work is an anathema to his temperament. ["I cannot sit inside all day, I was outside everyday...I do not want to sit inside all day, it is very hard for me."]

Mr. Orcutt's vocational experience has been consistently within the construction trades, primarily with his uncle. Right before the accident, he was receiving unemployment insurance, temporarily laid off, slated to begin work in construction once the winter passed and business increased. Construction was "my career." He enjoyed this physical outdoor environment.

Mr. Orcutt's premorbid history is unremarkable in connection with unusual medical or neurologic problems. He was taking no medication on a regular basis. He

denied history of substance abuse or involvement with the criminal justice system. He did though have a history of psychiatric care and counseling, during childhood and adolescences, treatment required when he was placed in foster care and also related to his diagnosis of ADHD. However, after he left foster care, he stopped treatment, including psychiatric medications. At the time of his accident, as noted, he was on unemployment insurance from his construction job, living alone, dating, and enjoying socializing and "quad riding." As noted, he planned to continue in construction.

Current Complaints

He is an incomplete paraplegic with loss of motor and sensory function from essentially right below his chest down. He does not have any problems with his arms. His right leg is somewhat more competent than his left leg in both sensation and movement, with the left leg for all practical purposes insensate. He is able to move his right "toe up and down for a burst". He cannot ambulate. He is restricted to a wheelchair. He is able generally to urinate, but he has leakage at night requiring Chux pads on his bed. His bowel program is negotiated by digital stimulation, necessitating gloves and lubricants, every other day. He does not use laxatives. This procedure takes about an hour in the morning. Fortunately, he does not have any leakage or accidents. He still has spasticity mostly in his right leg. He has swelling in his legs at times, particularly when it is hot. Low blood pressure, pressure sores on his buttocks, and dysreflexic reactions have not occurred recently.

However his abdomen "locks up" and in the morning "my body literally is locked", necessitating that he stretch his legs. As could be expected although he is able to

urinate, he has erectile dysfunction. Current equipment includes a wheelchair, a shower bench, a commode, a ROHO cushion, wheelchair gloves and elbow guards. Intellectually, he denies any changes in his cognitive status. Likewise, he denies severe changes in his psychological adjustment. However he does feel anxious when in a car, is hypervigilant, always looking about and fearful of an additional injury. However, his belief is that his reaction is an expected one to a catastrophic accident, primarily compromising his quality of life, but not necessitating the need for formal psychiatric care.

Mr. Orcutt plans to continue in his rehabilitation. His hope is to try to develop an "accommodated" work situation, such as in his own business, which would work around his physical limitations. Ideally, he envisions trying to restore his life to some degree of normalcy, such as developing a relationship and even marrying.

In order to generate an understanding of Mr. Orcutt's current vocational parameters a vocational investigation ensued. Within a standard individually administered intelligence test, Mr. Orcutt's overall functioning falls within the low average range. However, this global score fails to capture the significant even relatively uncommon discrepancy between verbal and nonverbal skills with verbal-linguistic skills centering between the borderline to low average range while nonverbal functioning falls between the low average and average range. A similar but not as extreme dichotomy is noted within an additional cognitive survey with visual skills again better developed than verbal abilities. Nonverbal processing speed is congruent with his nonverbal functioning in general, solidly average.

The academic survey reveals reading skills on high school levels centering around the average range when contrasted to his age peers; math calculation skills are overall average when contrasted to his age peers. Although his knowledge of math is on high school levels, he displays an above-average mathematics facility.

Performance on a routine clerical assignment, a task with a strong processing speed component, again is above average. Color discrimination is unimpaired. Upper dexterity motor skills vary. As noted, he had unusual difficulties on one assignment necessitating extended use of fine tools and instruments, complaining of fatigue, necessitating a hiatus in the middle of the assignment, when his hand began to shake. Other upper dexterity motor assignments range between the low average and average levels.

Synthesizing these assignments with his history, no better than high school level academic skills are displayed. His vocational aptitudes in terms of the general intelligence, verbal skills, and visual-spatial abilities center around the low average to average range with average to high average abilities evident in numerical aptitude and clerical speed and accuracy. Upper dexterity motor skills, for short periods, range between low average and average levels as well.

In order to assess his adjustment, Mr. Orcutt completed two objective personality inventories in which he rendered an opinion of himself and his life. In the first inventory, in which he contrasted his past and current adjustments, he produced a valid profile implicating that his report can be viewed with confidence. As could be anticipated, he acknowledges significant precondition problems in attending, commensurate with his premorbid history of ADHD. However, there are no indications of other cognitive

difficulties noted in the precondition scenario. Although some variation is evident, the global difference in his cognitive functioning between pre and post injury scenarios is still insignificant. In terms of his psychological adjustment, he does not report any severe precondition psychological problems as well, but does report a severe increase in post injury posttraumatic stress symptomatology, use of substances (which reflects his use of marijuana, which will now be incorporated into a medical marijuana prescription), in greater isolation and difficulties in his interpersonal relationships. A significant deterioration is of course evident in his physical status. Most impressive is the severe deterioration in his capacity to negotiate activities of daily life. As noted, he is much more socially isolated and severely unhappy with his vocational options.

Mr. Orcutt completed a second inventory in which he rated his overall quality of life as contrasted to a community sample. As could be anticipated, he rated his current overall quality of life as low, below 89% of the community group. Health, avocational pursuits, and intimacy are among those realms most negatively compromised.

Vocational Implications

Mr. Orcutt reports a history of ADHD. It is not surprising that he was thus never academically oriented and opted to find work of a physically active nature such as in construction. This work suited his temperament. If not but for his injury, the most probable precondition vocational course would have been continuing in physically oriented work such as, a construction laborer. Viewing the average wages for construction laborers in Connecticut as of May 2011 reveals an earning potential of $44,360 per annum (US Bureau of Labor Statistic Given his history of ADHD, a mild reduction in workforce participation could be expected ranging from nil to no more than

5%, particularly, as it appeared that he had no significant comorbid difficulties as an adult often associated with ADHD symptomatology.

At this point Mr. Orcutt is restricted to sedentary work, significantly compromising his options to engage in the type of work he finds most conducive to his temperament. [Obviously, in either scenario, work of a hazardous nature would be contraindicated given potential difficulties with extended concentration and focusing, possible residuals related to his ADHD symptomatology.] Regardless, he now has significantly more limitations in terms of work emphasizing lower extremity activities as well. Where before he was able to negotiate heavy to very heavy work without any other physical or working condition restrictions, now no more than sedentary work can be expected. There will be a significant reduction in vocational accessibility. In either scenario, no more than semi-skilled work could be expected given his difficulty with long-term training and educational settings. Consequently, only limited retraining can now be expected. Hopefully he should eventually be able to reenter the world of work, in some type of "accommodated" work situation, with modest wages but with a significantly truncated work life. He has a severe work disability. His outcome is likely to be similar to other spinal cord injured individuals in terms of his capacity to work and find work throughout his work life. Expected difficulties can be anticipated as aging and disability interface as well, lowering his workforce participation accordingly.

Labor Market Analysis

In order to concretize the pre and post-injury vocational accessibility and earning potentials, a computerized job match was conducted using the OASYS system, designed to provide an assessment of an individual's access and transferability in

selected labor markets. The program is capable of analyzing the worker characteristics of the over 12,000 plus job titles from the Dictionary of Occupational Titles (DOT), then crossing to the 2011 Bureau of Census average wage data from Bureau of Labor Statistics (utilizing SOC categories and OES wage data) to indicate the impact of Mr. Orcutt's injury on future wage earning capacity and future job accessibility.

This program examines data obtained from the (DOT) Dictionary of Occupational Titles (Revised Fourth Edition, Dept. of Labor) and the (COJ) Classification of Jobs.

Wage potential is reflected in the top 250 occupational titles and the top 25% of all titles or all titles if a sufficient number of titles is not matched.

Utilizing the parameters from the current investigation, without any additional physical or working condition restrictions, aside from removal of hazardous work, Mr. Orcutt retained average vocational accessibility to 9% of jobs in the Connecticut labor base with an average earning potential of $40,331.75/per annum as reflected in 2011 wages, fringe benefits omitted.

Without changing training time, educational levels, cognitive vocational aptitudes, or upper extremity vocational aptitudes, but restricting him to sedentary work and precluding lower extremity activities as well, Mr. Orcutt retained average vocational accessibility to less than 1% of jobs with a median earning potential of $33,507.50/per annum as reflected in 2011 wages, fringe benefits omitted.

The type of vocational domains that would have been available to Mr. Orcutt and are now precluded by his condition would have been in such areas as: Healthcare Support Workers, Animal Control Workers, Tree Trimmers/Pruners, Construction Laborers, Drywall/Ceiling Tile Installers, Tile/Marble Setters, Automotive Service

Technicians/Mechanics, Truck Drivers Heavy/Tractor Trailers, Sailors/Marine Oilers, and Excavating and Loading Machine Operators.

The type of vocational domains now theoretically available to Mr. Orcutt (and of course would have been available in the precondition scenario) would be in such areas as: Cashiers, Bookkeeping/Accounting/Auditing Clerks, Office Administrative Support Workers, Electrical/Electronic Equipment Assemblers, Grinding/Polishing Workers, Painting/Coating/Decorating Workers, and Inspectors/Testers/Sorters/Samplers/Weighers.

<u>Workforce Ramifications</u>

If Mr. Orcutt had not been injured, a minimal reduction in workforce participation is postulated, congruent with his history of residual ADHD symptomatology estimated as nil to 5%. At this point, in addition to any repercussions from his ADHD symptomatology, he now has severe physical limitations. His outcome is likely to be similar to other individuals with a severe work disability, as well as those with a spinal cord injury population in general. Viewing recent statistics on spinal cord injury highlight the negative ramifications of a spinal cord injury upon one's participation in the workforce. For instance, at one year post injury, only 11.7 persons with an SCI are employed; by 20 years post injury, only 35.2% are employed and a similar level of employment is observed in post injury year 35 <u>(Spinal Cord Injury Facts and Figures at a Glance, February 2012).</u> Consequently, a similar outcome for Mr. Orcutt can be expected resulting in an approximate <u>at least</u> 2/3's loss in lifetime workforce participation.

<u>Conclusion and Rehabilitation</u>

If Mr. Orcutt had not been injured, an earning potential of approximately $44,360/per annum could be expected when able to find employment in construction (reduced to $43,251/per with a reduced worklife). These wages are congruent with the types of wages that would have been anticipated if he had not remained a construction laborer (i.e., in the general labor force $40,331.75 when able to find employment). His precondition work life at most would have been minimally reduced between nil to 5% (resulting in a pre-injury average earning potential in the general labor force of $39,323.45). At this point, an earning potential, when able to find employment, of approximately $33,507.50/per annum in the general labor force can be expected with at least an additional approximate 2/3's loss in lifetime workforce participation, culminating in a future annual wage of approximately $11,169.16/per annum, more of a "therapeutic outlet", than reflecting a viable earning potential. In the meantime, Mr. Orcutt requires a multidisciplinary approach. His care will be headed by a physiatrist who will function as his medical case manager. Additional specialists such as urology and podiatry can be expected. Physical therapy is needed not to only monitor his exercise program, but also periodically in terms of palliative care. Psychological and psychiatric care are only listed on an as-needed basis. He certainly remains "at risk" for additional problems given the added stresses of his condition, but so far, he appears to be weathering his condition adequately. Other specialists such as dermatology, plastic surgery, etc. may be required if complications ensue. Unfortunately, even in the most "optimistic" scenario, particularly as he ages, periodic complications are expected as aging and disability interface. He is likely to require hospitalization congruent with other paraplegics over his lifetime. An appropriate exercise equipment to maintain his physical status and

cardiovascular integrity are strongly recommended. This is not only important in terms of his physical rehabilitation, but in terms of his psychological adjustment given his temperament towards a very active lifestyle. Some type of medication will be required. If medical marijuana is not sufficient, he will require ongoing prescribed medications. Equipment will persist such as a wheelchair, an adapted van with controls (after an appropriate drivers' evaluation and instructional), additional ancillary equipment, etc. He will require a wheelchair accessible home modified to his wheelchair status with additional equipment such as a roll-in shower and commode chair. Vocational counseling and refraining can be expected, but only for a short duration. Personal items for his bowel and bladder program will persist. He will require ongoing diagnostic and laboratory tests. In addition, a supportive network is necessary, for the foreseeable future primarily regarding housekeeping services, becoming more intensive as he ages, as well as home maintenance assistance. As an elderly spinal cord injured person, he will require additional personal care.

C. **SPECIAL DAMAGES**

**Medical Providers**
Please refer to the attached "Schedule A" for an itemization.

                          THE PLAINTIFF,
                          CHARLES ORCUTT
                          BY HIS ATTORNEYS


                          _____
                          Samuel M. Radner, Esquire
                          The Haymond Law Firm, P.C.
                          999 Asylum Avenue

Hartford, CT 06105
Telephone: (860) 728-5672
Fax: (860) 247-9384
E-Mail: sradner@haymondlaw.com
Federal Bar Number CT ct26863

## CERTIFICATE OF SERVICE

I, Samuel M. Radner, Esquire, hereby certify that on May 29, 2014, a copy of the foregoing, Plaintiff Charles Orcutt's Damages Analysis was served via first class mail, postage prepaid, and served via facsimile, to the following counsel of record:

> James M. Campbell (Juris # 09276)
> Michelle I. Schaffer (Juris # 15607)
> Stephen I. Hansen (Juris # 29340)
> Campbell Campbell Edwards & Conroy
> One Constitution Center, 3rd Fl.
> Boston, MA 02129

_____
Samuel M. Radner, Esquire
The Haymond Law Firm, P.C.
999 Asylum Avenue
Hartford, CT 06105
Telephone: (860) 728-5672
Fax: (860) 247-9384
E-Mail: sradner@haymond-law.com
Federal Bar Number CT ct26863

**SCHEDULE A**

Case 3:13-cv-01455-MPS   Document 25   Filed 05/29/14   Page 19 of 20

SCHEDULE A

# COLLATERAL SOURCE SHEET

**Client Name: Charles Orcutt**  Case #: 20337

| Medical Provider | Dates of Service | Reason for Service | Charge For Treatment | State of Connecticut, Medicaid | Write Offs | Balance |
|---|---|---|---|---|---|---|
| American Medical Response of Connecticut, Inc. | 1/26/2011 | Amb | $740.70 | $247.62 | 493.08 | $0.00 |
| Hartford Hospital Professional Services | 12/21/2010 | Physician | $151.00 | | 7369 | $0.00 |
| | 12/22/2010 | Physician | $456.00 | | 1726 | $0.00 |
| Jefferson Radiology | 12/21/2010 | RAD | $2,305.00 | $615.23 | 1689.77 | $0.00 |
| | 12/22/2010 | RAD | $42.00 | $11.31 | 30.69 | $0.00 |
| | 12/23/2010 | | $221.00 | $59.02 | 161.98 | $0.00 |
| | 12/31/2010 | RAD | $2,974.00 | $660.31 | 2313.69 | $0.00 |
| Life Star Ambulance Service | 12/21/2010 | Amb | $7,271.74 | $3,785.00 | 3486.74 | $0.00 |
| Hunter's Ambulance Service, Inc. | 12/21/2010 | Amb | $639.00 | $74.80 | 564.2 | $0.00 |
| Hartford Hospital | 12/21/2010 | ER | $165,831.56 | $55,899.00 | 109932.56 | $0.00 |
| Hartford Anesthesiology Associates, Inc. | 12/22/2010 | Anes | $3,960.00 | | 3960 | $0.00 |
| Hartford Pathology Assoc. | 12/22/2010 | | $43.00 | $7.24 | 35.76 | $0.00 |
| Hospital for Special Care | 1/26/2011 | | $73,748.58 | $46,718.70 | 27029.88 | $0.00 |
| | 6/17/2011 | Clinic | $203.55 | | | $203.55 |
| | 12/8/2011 | PT | $765.00 | $304.00 | 461 | $0.00 |
| | 11/21/2011 | PT | $176.00 | $76.00 | 100 | $0.00 |
| Neurosurgeons of Central Connecticut, P.C. | 12/22/2010 | | $21,325.00 | $1,986.05 | 19338.95 | $0.00 |
| Easter Seals Greater Hartford Rehabilitation Center, Inc. | 3/5/2012 | | $1,268.29 | $557.83 | 421.8 | $288.66 |
| VNA of Central Connecticut, Inc. | 3/10/2011 | Visiting | $2,015.00 | $1,305.58 | 709.42 | $0.00 |
| | 4/1/2011 | Visiting | $1,700.00 | $1,072.82 | 627.18 | $0.00 |
| | 5/1/2011 | Visiting | $880.00 | $551.76 | 328.24 | $0.00 |
| | 6/3/2012 | Visiting | $40.00 | $40.00 | | $0.00 |
| ProHealth Physicians of Farmington | 10/22/2013 | PCP | | | | $0.00 |

## Totals
**Total Billed:** 295244.42
**Insurance Paid:** 294752.21
**Client Paid:**
**Total Write Offs:**
**Remaining Balance:** 492.21